J-A16030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.P.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 703 EDA 2018 |

Appeal from the Decree February 14, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000233-2016

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 30, 2018**

A.P.R. (Father) appeals from the decree,[1] entered in the Court of Common Pleas of Philadelphia, terminating his parental rights to his minor son, J.C.G. (Child) (born 12/2007) and changing the goal to adoption.[2]  After careful review, we affirm on the basis of the opinion authored by the Honorable Allan L. Tereshko.

The Philadelphia Department of Human Services (DHS) became involved in the case in May 2014, after receiving reports that Child's parents were not properly caring for Child, that Child's parents had substance abuse issues, and

---

[1] The trial court states that Father "appeals from the Decree and Order" terminating his parental rights and changing the permanency goal to adoption. **See** Trial Court Opinion, 4/13/18, at 1.  However, for ease of reference, we will solely use decree throughout the memorandum.

[2]  Mother's parental rights were involuntarily terminated on February 14, 2018.  She is not a party to this appeal.

that Child's living conditions were not suitable. Child, who is non-verbal, was 6 years old at the time and was not toilet trained or enrolled in school. Child was found to be autistic. Both Mother and Father were unemployed. When DHS attempted to locate the family, the agency discovered that they had been evicted from their apartment in March of 2014.

On June 17, 2014, DHS received reports that Father and Child were sleeping on the street and that the police had taken them to a Salvation Army Red Shield Shelter. They were no longer at the shelter when DHS arrived. DHS finally located Child on June 18, 2014, when it received a call from Child's maternal aunt, L.G., who had Child and Child's older sibling[3] in her care.

Hearings for both children were held on July 12, 2014. Both Mother and Father were awarded supervised visitation and mandated to undergo drug screenings and assessments. At this time, the whereabouts of Mother and Father were unknown. On January 15, 2015, and April 24, 2015, Father presented himself to Clinical Evaluation Unit (CEU) for drug screening. Father tested positive for benzodiazepines on both occasions, but was able to provide verification of his prescriptions for the drugs. Father was awarded one hour of weekly supervised visitation with Child. Father consistently attended his scheduled visits with Child.

The court held a contested termination hearing held on December 21, 2017. At the hearing, Sean Donolon, a former case manager at Catholic

---

[3] Parental rights with regard to Child's older sibling are not at issue in the present appeal.

Community Services, expressed concern for Father's ability to care for Child. Among other things, Donolon was concerned Father would allow Mother to have contact with Child, and that Father could not properly care for Child due to Father's own disabilities.[4] Donolon testified to the lack of a bond between Father and Child, stating that he believed no irreparable harm would occur to Child if Father's parental rights were terminated. James Ross, another case manager who observed Father and Child during supervised visitation, also testified that he believed no irreparable harm would occur to Child if Father's parental rights were terminated.

Father testified that he is receiving drug treatment and that he has been clean for eight years. He also claimed that he successfully completed anger management and parenting classes. At the termination hearing, Father presented photos of his apartment and of him and Child allegedly hugging. Father submitted these photos into evidence to demonstrate the suitability of his housing and of his bond with Child. Father denied being in a relationship with Mother. The trial court discredited Father's testimony, pointing to multiple instances in which Father tried to manipulate the facts of the case. **See** N.T. Termination Hearing, 2/14/18, at 39-42. The court ultimately terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1),(2),(5),(8), and (b) of the Adoption Act.[5]

---

[4] It is alleged that Father has cognitive disabilities, possibly resulting from drug-related seizures.

[5] 23 Pa.C.S. §§ 2101-2910.

Father filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He claims the trial court erred when it terminated his parental rights, that he has remedied the conditions leading to Child's placement, that he has completed all of his court ordered goals, that he has the capacity to care for Child, and that he has a strong bond with Child.

The standard on appeal for termination of parental rights is as follows:

> Appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012) (citations omitted). The scope of our review in such cases is broad and requires a comprehensive review of the record. *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000).

After careful review, it is clear that the trial court's findings are supported by the record. *In re Adoption of S.P.*, *supra*. At the time of the termination hearing, Child had been in placement for four years. Although Father has obtained housing, it is unclear that the accommodations are suitable for Child. Although he has never tested positive for drugs during the

course of this case (save for those that are prescription medications), Father has failed to attend random drug screens. According to Mr. Donolon's testimony, Father is still in treatment at a methadone clinic and is receiving mental health counseling. Moreover, there is a legitimate concern that Father is still involved with Mother, whose parental rights have also been terminated. Father is on a fixed income and suffers from disabilities of his own. It is clear from the record that Child will require around-the-clock care, and that Father is unlikely to be able to provide such care.

It is also apparent from the record that changing the goal from reunification to adoption is in Child's best interest. There is evidence that Child is not bonded with Father and will not suffer irreparable harm if Father's parental rights are terminated. Child is bonded with staff members at Woods, where he receives autistic support services and twenty-four hour, individualized care. Child's teacher at Woods has expressed an interest in becoming an adoptive resource for Child.

We rely upon the opinion authored by Judge Tereshko in affirming the court's decree terminating Father's parental rights and changing the goal to adoption. We instruct the parties to attach a copy of that decision in the event of further proceedings in the matter.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/30/18</u>

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| | : |
| J.C.G., a Minor | : CP-51-AP-0000233-2016/CP-51-DP-0001563-2014 |
| | : |
| | : |
| APPEAL OF: | : |
| | : |
| A.P.R., Father | : Superior Court No.  703 EDA 2018 |

## O P I N I O N

A.P.R., ("Father"), appeals from the Decree and Order entered by this Court on February 14, 2018, granting the Petition to Involuntarily Terminate his Parental Rights and Change the Permanency Goal to Adoption of his Child:  ("J.C.G."), a male, born December    2007, filed by the Department of Human Services ("DHS"), on March 9, 2016, and served on all parties.   This Court Involuntarily Terminated the Parental Rights of Mother, E.H.G., at this hearing also, however, Mother did not file an Appeal.

In response to the Decree of Involuntary Termination of Parental Rights issued on February 14, 2018, Father filed a Notice of Appeal with Statement of Matters Complained of Upon Appeal on March 5, 2018.

J.C.G., has a sibling, J.G., a male born on March    1999, *CP-51-DP-0001562-2014*, who is currently in placement in Kinship Foster Care with a maternal aunt through Catholic Social Services.  A Permanency Review Hearing in that case is scheduled for June 22, 2018.

1

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Concise Statement of Matters Complained of on Appeal Pursuant to PA.R.A.P. 1925(b), Father alleges:

1. He has completed all of his objectives;
2. He has suitable housing for the Child;
3. He loves his Child and it is in the Child's best interest to not terminate his parental rights.

## PROCEDURAL HISTORY:

E.H.G., is the "Mother" of J.C.G., (Exhibit "B", Certificate of Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016).

A.P.R., "Father" of J.C.G., is listed as the Father on the Child's birth certificate. (Exhibit "B", Certificate of Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016).

On May 21, 2014, the Department of Human Services (DHS) received allegations that the Children's Mother, E.H.G., and Father, A.P.R., were not properly supervising or caring for the Child; that the parents had ongoing substance abuse issues; that the home was dirty and malodorous with food, clothing, and debris littering the floor; that there was no food in the cabinets; and that Mother appeared impaired and left the home to purchase drugs. It was alleged that Mother had stated that the Child was in a coma at an unknown hospital; that he had a rash that may have been caused by a spider bite; that the Children's maternal grandmother had previously resided with the family and had ensured that the Child's needs were met; and that the maternal grandmother had moved from the home in or about March 2014. It was alleged that the Child had been diagnosed on the autism spectrum and was nonverbal; that he was not toilet trained and wore diapers; that

2

the Child was not enrolled in school or daycare; that he had not been seen by a primary doctor since he was two years old; that he became agitated when he heard loud noises and would sit down, rock, and make a humming noise; that Mother had not had the Child evaluated; and that the Child resided with the Children's maternal grandmother and maternal aunt, L.G., in Montgomery County. It was also alleged that Father suffered from drug-related seizures; that he was not employed and received disability benefits; that he was cognitively delayed and may have suffered brain damage from the seizures; that Mother was in a methadone maintenance program, but may have been discharged from the program; that she was prescribed medication for a previous knee injury; that Mother was unemployed and received DPW benefits; that the Child was bonded with the parents and never appeared fearful in the care of the parents; and that the parents did not use physical discipline with the Child. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "a").

On May 21, 2014, DHS attempted to locate the family without success. DHS learned that they had been evicted from their apartment in March 2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "b").

On June 7, 2014, DHS visited maternal aunt, L.G.'s home. She stated that she had been caring for the older Child since November 2013 and was willing to continue to provide for his needs. The older Child stated he did not want to reside with his parents; that they used drugs; that they had been evicted from many apartments and had their utilities turned off numerous times; and that he wanted to remain with maternal aunt, L.G. She stated that Mother called the home and requested money and made threats of

3

harm on all of the household members and to set fire to the home. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "c").

DHS continued to investigate the whereabouts of the family, and on June 16, 2014, an in-depth search returned three possible addresses for the family. DHS visited the addresses, spoke with one current resident who had no knowledge of the family, and DHS left notification letters at the remaining two addresses for Mother to contact DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "d").

On June 17, 2014, DHS received allegations that Father and the Child were found by Philadelphia Police, sleeping on the street near a cemetery; that Father had a stroller with him filled with belongings; that the police had transported them to the Salvation Army Red Shield Shelter; that Father had the Child's medical insurance card, but no documentation of his paternity; that Father had stated that Mother had all the additional identification for the Child; that the family had been residing in a home where regular drug used occurred; and that Father had stated that he removed the Child on or about 6/15/2014, because he did not believe it was an appropriate environment for the Child. It was also alleged that the Child and the Father were dirty with soiled clothing; that the Child was nonverbal; that Father was cooperative and would be allowed to remain overnight at the shelter; and that Father was to go to the Office of Supportive Housing (OSH) when they opened later that morning. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "e").

4

On June 17, 2014, DHS went to the Salvation Army Shelter; however, Father and the Child had left the shelter and their whereabouts became unknown to DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "f").

On June 18, 2014, L.G., contacted DHS and stated that she now had the Child in her care. DHS scheduled to visit the home the following day. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "g").

On June 19, 2014, DHS visited L.G.'s home and observed the Child was safe with his basic needs being met. L.G., stated that Mother had contacted her on 6/18/2014, and asked her for money; that she told Mother that she would give her money if she could see the Child; that Mother agreed and she later met her and the Child; and that Mother would not state where she and the Child had been residing. L.G., stated that she asked Mother if she would allow her to care for the Child, and Mother gave her permission for the Child to reside with her. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "h").

L.G., requested approval as a Kinship care provider for both the Child, J.C.G., and his sibling, J.G. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "i").

Mother and Father both had a history of drug and alcohol use. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "j").

5

Mother and Father lacked stable housing and their whereabouts at the time were unknown to DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "k").

Adjudicatory Hearings were held for both Children on July 14, 2014, before the Honorable Allan L. Tereshko. Child Adjudicated Dependent. Legal Custody of the Child, J.C.G., was transferred to DHS, and placement in Kinship Foster Care with his maternal aunt. Parents to have biweekly supervised visits with the Child at the agency as arranged by the parties, when they avail themselves. When parents avail themselves, they are to be referred to CEU for dual diagnosis, drug screens and assessment. Parents to have three random drug screens prior to next court date. DHS to provide maternal aunt, L.G., with bunk beds, and appoints her as educational surrogate. DHS to obtain the Child's birth certificate. Child has been diagnosed with Autism. (Order of Adjudication—Child Dependent, 7/14/2014).

On September 15, 2014, CUA-CSS held an initial Single Case Plan (SCP) Meeting. The parental objectives established for the parents were to: 1) receive drug and alcohol assessment; 2) receive a mental health assessment and follow recommendations; 3) provide three random drug screens at the CEU; 4) contact CUA-CSS regarding supervised visits with the Children; 5) maintain supervised visits with the Children; and 6) make whereabouts known to CUA-CSS. Neither parent participated in the Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "n").

A Permanency Review Hearing for J.C.G., was held on October 16, 2014, before the Juvenile Court Hearing Officer, Carol A. Carson. The Court ordered that legal

6

custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship). Supervised visits with the parents to continue at the agency, visits to be suspended if parents appear under the influence. Child's occupational therapy, speech therapy, TSS, and behavioral therapeutic service in school to continue. Father re-referred to CEU forthwith for drug screen, assessment, dual-diagnosis, 3 random drug screens prior to next court date. (Permanency Review Order, 10/16/2014).

A Permanency Review Hearing for J.C.G., was held on January 15, 2015, before the Juvenile Court Hearing Officer, Carol A. Carson. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship). Supervised visits with the parents to continue at the agency, bi-weekly at recommendation of the Child's therapist or treatment team. Father to comply with all services and recommendations. Father referred to CEU forthwith for drug screen, assessment, dual-diagnosis, 3 random drug screens prior to next court date. All of Child's therapeutic services to continue. (Permanency Review Order, 1/15/2015).

On January 15, 2015, Father was seen at CEU where he tested positive for amphetamines and benzodiazepines. Father provided CEU with verification of his prescribed medications which substantiated the positive screening for amphetamines and benzodiazepines. Father also provided CEU with verification of his engagement in drug and alcohol treatment at Addiction Medicine and Health Advocates, Inc. (AMHA). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/09/2016, ¶ "r").

7

A Permanency Review Hearing for J.C.G., was held on April 6, 2015, before the Juvenile Court Hearing Officer, Michael G. Campbell. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship). Father to begin weekly supervised visits at the agency. Referral made for therapeutic visits for Father through ATA. Mother and Father referred to CEU forthwith for drug screen, assessment, dual-diagnosis, 3 random drug screens prior to next court date. Agency to contact parents for random screens. Parents to sign for Child's medical. Child receives school based services (physical, speech and occupational therapy). Child also receives medication management services. (Permanency Review Order, 4/06/2015).

On April 8, 2015, CUA-CSS held a revised Single Case Plan (SCP) Meeting. The parental objectives for the parents the same as the previous SCP. Although they were invited, neither parent participated in the Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 5/23/2017, ¶ "t").

On April 24, 2015, Father was seen at the CEU where he tested positive for benzodiazepines. Father provided the CEU with verification of his prescribed medications which substantiated the positive screening. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 5/23/2017, ¶ "u").

A Permanency Review Hearing for J.C.G., was held on May 18, 2015, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care

(Kinship) through Catholic Social Services: Mother and Father are offered weekly supervised visits with the child at the agency. Mother has not visited the Child, Father has visited the Child. Child attends an Autistic Support Program, and receives speech therapy and life skills medication management through St. Christopher's. Reports from CEU are incorporated by reference. Mother and Father referred to CEU forthwith for drug screen, assessment, dual-diagnosis, 3 random drug screens prior to next court date. Agency to contact parents for random screens. (Permanency Review Order, 5/18/2015).

In July 2015, CUA-CSS received a report with allegations that Father had attempted to sell Adderall and Wellbutrin to a visitation coach. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 5/23/2017, ¶ "w").

A Permanency Review Hearing for J.C.G., was held on August 10, 2015, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. All appropriate medical care for Child to continue. Father attends Cognitive Behavioral Health (CBH), and Father's weekly supervised visits to continue at the agency. Father to continue parenting classes, obtain appropriate housing. CEU report for Father incorporated by reference. Father to continue drug and alcohol treatment at AMHA. CEU to monitor Father. CUA to provide copies of Father's psychological evaluation and reports from Friends Hospital at next court date. (Permanency Review Order, 8/10/2015).

On December 23, 2015, CUA-CSS held a revised Single Case Plan (SCP) Meeting. The parental objectives for the parents remained the same as the previous SCP.

9

Although they were invited, neither parent participated in the Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 5/23/2017, ¶ "y").

A Permanency Review Hearing for J.C.G., was held on March 22, 2016, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. No action taken, STATUS QUO. (Permanency Review Order, 3/22/2016).

A Permanency Review Hearing for J.C.G., was held on July 12, 2016, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship). Father to have alternating supervised visits at the agency and community visits. (Permanency Review Order, 7/12/2016).

A Permanency Review Hearing for J.C.G. was held on September 22, 2016, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. Father to have alternating supervised visits at the agency and community visits. DHS commit stands. (Permanency Review Order, 9/22/2016).

A Permanency Review Hearing for J.C.G., was held on January 19, 2017, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. Child attends Myer Elementary School in

10

special education. Child receives occupational, physical and speech therapy. Child's medical is up to date. Mother and Father reside at 2846 Kensington Ave., Philadelphia, PA 19134. Child to remain as committed. Mother and Father are re-referred to CEU Unit for forthwith drug screens, assessments and 3 random drug screens prior to the next court date. Parents are to be referred to ARC for housing. Father is to provide documentation to the CEU Unit regarding drug treatment. CUA to explore voluntary termination petitions with Parents. (Permanency Review Order, 1/19/2017).

A Hearing was held on April 25, 2017, before the Honorable the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. Case continued for Legal Liaison Unit to administratively appoint counsel for the Child and DACAU to remain as GAL. (Status Review Order, 4/25/2017).

A Hearing was held on July 12, 2017, before the Honorable the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement with maternal aunt is to continue in Foster Care (Kinship) through Catholic Social Services. Continuance requested by T. McCullough, Attorney for Father, is unavailable. (Status Review Order, 7/12/2017).

A Permanency Review Hearing for J.C.G., was held on September 21, 2017, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement remains at Group Home at The Woods. Visitation with Father shall remain supervised in accordance with the Woods policy. Child to remain committed. Court appoints CASA as the educational decision maker. Father is referred to the CEU Unit for forthwith drug screen, assessments and monitoring,

11

and 3 random drug screens prior to the next court date. Father to sign appropriate releases. (Permanency Review Order, 9/21/2017).

A Permanency Review Hearing for J.C.G., was held on December 21, 2017, before the Honorable Allan L. Tereshko. The Court ordered that legal custody of the Child to remain with DHS, and placement remains at Group Home at The Woods. Child is doing well. Father is engaged with drug and alcohol treatment. Child receives autistic support and 24 hour one on one through Woods. Specialist from Woods to appear at the next listing. (Permanency Review Order, 12/21/2017).

## TERMINATION HEARINGS

On December 21, 2017, this Court held the initial Contested Termination of Parental Rights and Goal Change Hearing. Michael Pratt, Esquire, counsel for DHS presented the first witness, Sean Donlon, former Case Manager from Catholic Community Services. Mr. Donlon testified he was Case Manager from February 2015, until March 2016, and stated the family became known to DHS when a report was filed that the parents were not supervising the Child appropriately. The report noted a history of drug abuse by both Mother and Father, and that Father also had a history of drug related seizures. They had issues regarding dirty and malodorous housing, and no food in the house. He noted that the Child's sibling, J.G., born March 1999, was residing with his maternal aunt, L.G. (N.T., 12/21/2017, p.8 at 14-25; p.9 at 1-25; p.10 at 1-8).

Mr. Donlon testified that on 6/17/2014, a police officer found Father with the Child outside in a cemetery, and the Father and Child were taken to a Salvation Army Shelter. DHS attempted to contact Father at the shelter, however, he had left. The

12

Child's whereabouts became known to DHS when maternal aunt, L.G., called DHS and stated she had the Child in her home. Maternal aunt stated the Mother wanted money in exchange for the Child. (N.T., 12/21/2017, p.10 at 10-25; p.11 at 1-4).

Mr. Donlon stated he held a Single Case Plan Meeting in August 2014, and that Father's objectives were established to address his drug use. The Court ordered random drug screens and dual diagnosis assessments. On 4/24/2015, Father's drug screen was positive for benzos, and Father showed CEU a prescription. Another drug screen on 5/18/2015, was negative. Father failed to attend random drug screens that Mr. Donlon had personally requested or had requested via text messages. He noted that Father was in a drug treatment program, AMHA since 2011, and was attending a Methadone Maintenance Program at the same facility. Father was also receiving mental health counseling and medication management services at Cognitive Behavior Services at that time. (N.T., 12/21/2017, p.11 at 5-9; p.14 at 4-25; p.15 at 1-10).

Regarding visitation, Mr. Donlon testified Father had supervised visitation at the agency for one hour per week. He noted that Father was consistent in attending the scheduled visits. The Child is nonverbal autistic, has special needs, and received education and therapy services at Meyers Elementary School during the time he supervised the case. He observed Father's interaction with the Child at visitations and noted that Father tried to interact with the Child, however, the Child didn't make eye contact with Father and did not appear to be interested. Further, he noted that Father failed to correct the Child for not using the bathroom to relieve himself, and Father didn't appear overly concerned that the Child would relieve himself in the office rather than the bathroom. (N.T., 12/21/2017, p.15 at 11-25; p.16 at 1-25; p.17 at 1-7).

13

Mr. Donlon opined that it would be in the Child's best interest to be adopted because he had concerns regarding Father's unstable living situation, and that Father would continue to allow Mother contact with the Child. He expressed concern regarding the Child's safety and noted that the Child needs 24 hour supervision, and Father cannot care for him due to his disabilities. He also believes there is no bond between the Father and the Child, and therefore, the Child would not suffer irreparable harm if Father's parental rights were terminated. He opined the Child has been in care for over forty-one months, and it is in his best interest to obtain permanency through adoption. (N.T., 12/21/2017, p.17 at 8-25; p.18 at 1-25; p.19 at 1-6).

On cross-examination by Faryl Bernstein, Child Advocate, Mr. Donlon testified that Father told him he was attempting to get the Child's Mother approved as his home health aide to assist him with walking and using his crutches. He testified that during the period he managed the case, Father and Mother were in a continuous relationship. Therefore, he continues to be concerned that Father may have Mother in his home and wants her to help care for the Child. (N.T., 12/21/2017, p.19 at 14-25; p.20 at 1-25; p.21 at 1-25; p.22 at 1-19).

James Ross, Case Manager at Catholic Community Services, was the next witness to testify. He stated he became the Manager in March 2016, and at that time Father had a substance treatment objective and he was ordered to CEU for random drug screening. Father missed a few random screens, however, screens on 12/6/2017 and 12/14/2017 were negative. Father continues to attend methadone treatment at AMHA, however, has not provided any documentation of his treatment, nor has he provided any documentation

14

of successfully completing any mental health program. (N.T., 12/21/2017, p.34 at 3-11; p 37 at 4-25; p.38 at 1-25; p.39 at 1-4).

Regarding visitation, Mr. Ross testified he has supervised visits between the Father and Child, and stated Father attempts to engage the Child, however, the Child does not reciprocate. At times Father would forget to bring the Child treats, and the Child would become upset, whereupon Father would ask him to handle the Child and wanted to abruptly end the visit. Father stated he did not want to see his son in that state. Mr. Ross testified that on one occasion he had to chase the Child across a parking lot into an open field because the Child ran away from Father and Father was unable to run after him. Mr. Ross also stated Father appeared to be intimidated by the Child's behavioral outbursts, and by the fact that the Child would not allow Father to comfort him. Mr. Ross stated he has witnessed staff members at Woods comfort the child when he was upset, and allows them to hug and hold his hands. However, he does not allow Father to do the same. (N.T., 12/21/2017, p.39 at 5-25; p.40 at 1-25).

Mr. Ross testified the Child receives autistic support, and has 24-hour one on one supervision because of his behavior. He notes the Child has made progress now that he is at Woods receiving the appropriate services. The staff is working on communication skills for the Child, and having him able to identify different pictures. He is also being potty-trained. Mr. Ross opined the Child would not suffer irreparable harm if Father's rights were terminated because the Child is not bonded with the Father. He is bonded with staff members at Woods and responds to them. The Child's current teacher, A.G., has expressed an interest in being an adoptive resource. He further opined that it would

15

be in the Child's best interest to be adopted. (N.T., 12/21/2017, p.41 at 1-25; p.42 at 1-19).

On February 14, 2018, this Court held the second Contested Termination of Parental Rights and Goal Change Hearing. Father, A.P.R., attended and was represented by counsel, Timothy McCullough, Esquire. (N.T., 2/14/2018 at p.4 at 14-15).

Father testified that he was currently living in a one-bedroom apartment at 655 East Allegheny Ave., Philadelphia, PA. He stated he receives veteran's pension payments from nine years of military service. Father noted he completed parenting classes, anger management, credit and housing classes and stated he had certificates of completion for each of those. (N.T., 2/14/2018 at p.17 at 6-25; p.18 at 1-9).

Father further stated he has been receiving drug treatment for a period of time, and claims he has been clean from drugs for eight years. He attends counseling at the VA Center and also attends at AMHA, three meetings per week and has a sponsor. (N.T., 2/14/2018 at p.18 at 10-19).

Father presented photographs of his apartment and the sleeping arrangements, where the Child would sleep if he lives with him. He also presented photographs of himself and his son taken at The Woods at a Christmas event, to show that he and his son are close. Father stated he speaks to Mother frequently because she calls him, but he has not lived with Mother over two years, and that she lives in a room at 2846 Kensington Avenue. He resides at 655 East Allegheny and stated they live approximately 3 to 4 miles from each other. Father lastly stated his benefits are increasing from $1794.00 per month to $1830.00 per month, and he is moving from that

16

apartment to a two-bedroom house within four to six weeks. (N.T., 2/14/2018 at p.25 at 1-25; p.26 at 1-25; p.27 at 1-25; p.28 at 1-24).

Regarding visitation, Father testified he visits his son two to three times a week, and notes that the Child loves him and trusts him. Although Father agrees that the Child is non-verbal, he claimed the Child says "daddy...daddy", and has said, "Daddy I love you." Father states the Child has physical contact with him by hugging and cuddling with him, and states they have a very strong bond. Father states he sees the Child at the Woods Center, and he calls his son every night to say good night. Father states Woods is a very good school for him, however, he claims the Child is totally unhappy there and that the Child belongs living with him because he would provide a better home. (N.T., 2/14/2018 at p.18 at 20-25; p.19 at 1-23; p.20 at 16-25; p.21 at 1-2, 20-25; p.22 at 1-2).

On cross-examination by Michael Pratt, attorney for DHS, Father admitted he accepted service for Mother's court notification on 12/20/2017. He explained that he also lived in a single room at the same address as Mother, but they were living in separate rooms. He also admitted he visited the Woods facility on Christmas to visit his son and appeared there together with Mother. Father claims they are not in an active relationship, although he has known her for fifteen years and they have a son together. Finally, Father admitted he was panhandling on the street, however, he claims he does not do that anymore. (N.T., 2/14/2018 at p.29 at 4-25; p.30 at 1-24; p.31 at 1-15).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and

convincing evidence." ***In re T.R.***, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***Matter of Sylvester***, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

This Child came to the attention of DHS on May 21, 2014, the Department of Human Services (DHS) received allegations that the Child's Mother, E.H.G., and Father, A.P.R., were not properly supervising or caring for the Child; that the parents had ongoing substance abuse issues; that the home was dirty and malodorous with food,

19

clothing, and debris littering the floor; that there was no food in the cabinets; and that Mother appeared impaired and left the home to purchase drugs. It was alleged that the Children's maternal grandmother had previously resided with the family and had ensured that the Child's needs were met; but then, the maternal grandmother had moved from the home in or about March 2014. It was alleged that the Child had been diagnosed on the autism spectrum and was nonverbal; that he was not toilet trained and wore diapers; that the Child was not enrolled in school or daycare; that he had not been seen by a primary doctor since he was two years old; that he became agitated when he heard loud noises and would sit down, rock, and make a humming noise; that Mother had not had the Child evaluated; and that the Child resided with the Children's maternal grandmother and maternal aunt, L.G., in Montgomery County. It was also alleged that Father suffered from drug-related seizures; that he was not employed and received disability benefits; that he was cognitively delayed and may have suffered brain damage from the seizures; that Mother was in a methadone maintenance program, but may have been discharged from the program; that she was prescribed medication for a previous knee injury; that Mother was unemployed and received DPW benefits.

On June 17, 2014, DHS received allegations that Father and the Child were found by Philadelphia Police, sleeping on the street near a cemetery; that Father had a stroller with him filled with their belongings; that the police had transported them to the Salvation Army Red Shield Shelter; that Father had the Child's medical insurance card, but no documentation of his paternity; that Father had stated that Mother had all the additional identification for the Child; that the family had been residing in a home where regular drug used occurred; and that Father had stated that he removed the Child on or

20

about 6/15/2014, because he did not believe it was an appropriate environment for the Child. It was also alleged that the Child and the Father were dirty with soiled clothing; that the Child was nonverbal; that Father was cooperative and would be allowed to remain overnight at the shelter; and that Father was to go to the Office of Supportive Housing (OSH) when they opened later that morning. On June 17, 2014, DHS went to the Salvation Army Shelter; however, Father and the Child had left the shelter and their whereabouts became unknown to DHS. On June 18, 2014, Maternal Aunt, L.G., contacted DHS and stated that she now had the Child in her care. L.G. requested approval as a Kinship care provider for both the Child, J.C.G., and his older sibling, J.G. The Child is currently placed in a group home through Woods and receives autistic support services, which includes 24-hour one on one care.

**The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5) and (8) [1]**

---

[1] 1(a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or

21

The focus of termination proceedings is on the conduct of the parent. To satisfy 23 Pa.C.S.A. §2511 (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months period prior to the filing of the petition, which reveals a settled purpose of relinquishing parental claim to a child or a failure to perform parental duties. *In Re: C.S., 761 A.2d 1197, 1201 (Pa.Super.2000).* 23 Pa.C.S.A. §2511 (a)(2) focuses on the Child and his/her present and future need for essential parental care, control or subsistence necessary for his/her physical or mental well-being. *In Re: C.A.W., 683 A.2d 911 (Pa.Super 1996)*

In his <u>Concise Statement of Matters Complained of on Appeal</u>, Father alleges he has completed all of his court ordered objectives, has suitable housing for reunification with his Child, loves his son, and it is in the Child's best interest for the Court not to terminate his parental rights. This Court disagrees.

This Court heard credible, clear and convincing evidence from both case managers, Sean Donlon and James Ross regarding Father's failure to perform parental duties, and inability to remedy the conditions which led to the Child's removal and placement. Mr. Donlon testified the parental objectives for Father were to address his drug use, get random drug screens and dual diagnosis assessment. On 4/24/2015, Father's drug screen was positive for benzos, and Father showed CEU a prescription. Father failed to attend random drug screens that Mr. Donlon had personally requested or had requested via text messages. He noted that Father was in a drug treatment program, AMHA since 2011, and he was attending a Methadone Maintenance Program at the same

---

placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

22

facility. Father also was receiving mental health counseling and medication management services at Cognitive Behavior Services during the time he was supervising the case. Regarding visitation, Mr. Donlon testified Father had supervised visitation at the agency for one hour per week. He noted that Father was consistent in attending the scheduled visits. The Child is nonverbal autistic, has special needs, and received education and therapy services at Meyers Elementary School during the time he supervised the case. He observed Father's interaction with the Child at visitations and noted that Father tried to interact with the Child, however, the Child didn't make eye contact with Father and did not appear to be interested. Further, he noted that Father failed to correct the Child for not using the bathroom to relieve himself, and Father didn't appear overly concerned that the Child would relieve himself in the office rather than the bathroom.

Mr. Ross testified he became the Manager in March 2016, and at that time Father had a substance treatment objective and he was ordered to CEU for random drug screening. Father missed a few random screens, however, screens on 12/6/2017, and 12/14/2017, were negative. Father continues to attend methadone treatment at AMHA, however, has not provided any documentation of his treatment, nor has he provided any documentation of successfully completing any mental health program. Regarding visitation, Mr. Ross stated he has supervised visits between the Father and Child, and that Father attempts to engage the Child, however, the Child does not reciprocate. At times Father would forget to bring the Child treats, and the Child would become upset, whereupon Father would ask him to handle the Child and end the visit. Father stated he did not want to see his son in that state. At one time, Ms. Ross had to chase the Child across a parking lot into an open field because the Child ran away from Father and Father

23

was unable to run after him. Father appeared to be intimidated by the Child's behavioral outbursts and the fact that the Child would not allow Father to comfort him. Mr. Ross stated he has witnessed staff members at Woods comfort the child when he was upset, and allows them to hug and hold their hands. However, he does not allow Father to do the same. He testified the Child receives autistic support, and has 24-hour one on one supervision because of his behavior. He notes the Child has made progress now that he is at Woods receiving the appropriate services. The staff is working on communication skills for the Child, and having him able to identify different pictures. He is also being potty-trained.

This Court is not persuaded that Father can or will remedy the conditions which brought the Child into court supervision. Nor is the Court persuaded that Father will be able to fulfill his parental responsibilities for this special needs Child in the future. The reality is Father is not in a position to take of this Child. Based on the evidence presented, this Court found clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a) (1), (2), (5) and (8).

**Trial Court Properly Found that Termination of Father's Parental Rights was in the Child's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[2]**

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best

---

[2] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court "shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d 251 (Pa. 2013).

Both Case Managers from Catholic Social Services provided credible, persuasive testimony regarding the Child's physical and emotional needs and best interests. Mr. Donlon opined that it would be in the Child's best interest to be adopted because he had concerns regarding Father's unstable living situation, and that Father would continue to allow Mother contact with the Child. He expressed concern regarding the Child's safety and noted that the Child needs 24 hour supervision, and Father cannot care for him due to his disabilities. He also believes there is no bond between the Father and the Child, and therefore, the Child would not suffer irreparable harm if Father's parental rights were terminated. He opined the Child has been in care for over forty-one months, and it is in his best interest to obtain permanency through adoption. Mr. Ross opined the Child would not suffer irreparable harm if Father's rights were terminated because the Child is not bonded with the Father. He is bonded with staff members at Woods and responds to them. The Child's current teacher, A.G., has expressed an interest in being an adoptive resource. He further opined that it would be in the Child's best interest to be adopted.

This Court found that credible, clear and convincing testimony was provided that the Child would not suffer irreparable harm if Father's rights were terminated and that termination of Father's parental rights and adoption would be in the Childs best interest.

25

This Court also finds Father's testimony not credible in many aspects. The Court is familiar with the geographical area mentioned as Father's place of residence. Father misrepresented the K&A area, and this Court does not find Father's testimony credible regarding his relationship with the Mother, and his statement that he does not and will not continue to panhandle for money on the streets. This Child has special needs and requires 24 hour care, which Father is not capable of providing.

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Children Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[3]**

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g)

Competent and persuasive evidence was presented to this Court by the Agency that reasonable efforts were made by the Agency to give Father the avenue to obtain the parental skills necessary for reunification with his Child, however, Father failed to progress and use the referrals and resources to advance his situation and stability.

---

[3] 42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1), Additional determinations. Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

26

## CONCLUSION

At the conclusion of the Hearing, the Court stated:

I made fairly long notes and the case is not new to me. I've had this case from the beginning. The case came in when the police actually found the father and the child sleeping on the street. The police took the child to a shelter. We tried a placement with the maternal aunt. That didn't work out.

The testimony of the witnesses, both case workers, are clear that the Mother had completed no goals, has satisfied no goals and failed to continue to have a parental relationship with the child throughout dependency of the case. And in fact, Mother and Father were living together in unacceptable circumstances. And since they were both living together the child was removed from their collective custody. Although, specifically, the child and father were found on the street.

The child is a very high needs child. Very, very high level on the autistic spectrum. The testimony, which I believe was uncontradicted was that the child was nonverbal. And that's been repeated a number of times. So, it causes me to suspect the testimony of father when he says that the child tells him that he loves him because I've never heard of an instance where the child was verbal at any point during this case. And I discredit father's testimony, but I'll come to that in a moment.

Now we come to father, and father presents a different case. And initially I have to find that although father presents what may be a compelling case for an opportunity to put himself in a position to parent this child, father's testimony is not believable. Almost at every level father is incredible.

Although he is very good at testifying and he is a little practiced in trying to manipulate certain facts to appear to benefit his case, but when cross examined even mildly the whole narrative falls apart. The narrative that he tries to create with these photographs and it appears more that the child is resistant at the father's attempts to hug him because he has placed his arms in between himself and the father. And it seems like he may almost be pushing father away. And there appears to be a likely case of the father almost

27

retraining the Child rather than it appearing to be an active physical attempt to hug father. There's no picture of a hug going on in any of these. There's one it looks like father's restraining the Child's arms.

And given Father's lack of credibility throughout the case it's within my providence to discredit what Father attempts to explain these pictures as representing. Next, as to the living conditions, Father was actually caught in a very blatant lie regarding his residence. And the issue has always been that Father tries to conceal the fact that he and Mother have an active relationship. And the idea that he suggested to the Court that they live three or four miles apart when it's more like eight to ten blocks because I'm very familiar with the area of Allegheny Avenue and Kensington Avenue. The center of the area is an area known as K&A. It's a high drug, high crime area. And I believe that they're actually within blocks of each other than miles of each other.

Another point where Father tried to manipulate the fact and probably ride upon the fact that no one else was aware of the geographical proximity of the locations, but he was at Mother's home and signed, and put his signature on a receipt of a mail service and could not explain it. Again the issue of credibility goes against Father's testimony.

The so-called revelation that he now has enough money to get a new home when his increase in benefit was a matter of $80.00. He didn't—he has the same income and chooses to reside in the decrepit conditions that he has resided in, no material change in that. Again, another attempt to manipulate facts, which under cross-examination or any scrutiny do not stand up.

The reality is he's not in a position to take care of this child. He has not remedied the issues. He made a good case making it appear as if the issues were remedied, but even with mild cross-examination the whole as I use the phrase, the whole narrative just fell apart.

This child has a lot of needs. Father cannot meet those needs now, will never meet the needs. He was panhandling. This was established as late as December 15th of last year. And the testimony was in the area of Grant and the Boulevard. He says he is not doing now. Again,

28

the issue of credibility weighs heavily in this case and Father is deemed not to be credible.

I've seen nothing that indicates that there is a bond between the child and his Father. Notwithstanding the attempt to introduce these photographs, which did not help. The testimony, which was uncontradicted was that Father's not capable of handling this child physically, emotionally or intellectually, and he never will be.

So considering the evidence under 2511 (a)(1), (2), (5) and (8), the Court finds that there would be no irreparable harm if the rights were terminated. And, although, we do not have an adoptive resource in place there is at least a potential for someone skilled. Someone who has the requisite parental skills to offer this child an opportunity and that's the best we can do at this point create an opportunity for this child and the only way that can happen is if I terminate Father's rights, which I do pursuant to the sections enumerated, that being 2511 (a)(1), (2), (5), (8) and 2511 (b). And the goal is changed to adoption for this Child.

For the foregoing reasons, this Court respectfully requests that the Decree and Order of February 14, 2018, terminating Father, A.P.R.'s Parental Rights to the Child, J.C.G., and Changing the Permanency Goal to Adoption, be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

4-13-18
DATE

29